May it please the Court, I hope I'm on the correct side here. It doesn't matter. You know why? I'll tell you why. Because it's rare that we have the State on that side. So that's why I kept looking at the other way, because usually the State is not the petitioner. Thank you. May it please the Court, my name is Adam Woodrum. I represent the Appellant Warden and State of Nevada Attorney General's Office. We have here an issue of a reversal of a murder conviction, a first-degree murder conviction, premeditated and deliberate murder. And as you said, it was a conviction that was made under an old instruction called the Kaslan Instruction. Through NECA, I'm sure you're familiar with the briefing, and through BAB, that instruction changed in Byford in 2000. And then we started using the Byford Instruction. And following Polk, the State of Nevada came out with NECA, said that was a change in the law. From this point forward, we will use the Byford Instruction. Now, what happened after that was we had BAB intervene and came up on appeal and was reversed, because BAB was granted, post-NECA, BAB was granted relief for the use of this, quote-unquote, bad instruction under Polk. Now, we've got a very similar situation here with Mr. Kerian. He received the Kaslan Instruction. By the way, do you know whether is BAB final now? In other words, I mean, is the State going to petition for cert or something like that? Do you know? Judge, BAB is final. BAB, Ms. BAB petitioned for cert. I did not counterpetition, and that was denied. So BAB is final, except that I should qualify that and say there were several claims that were not addressed by the district court that are now being addressed and pending before the district court. So the issue of the Kaslan Byford NECA Instruction is several. Okay. Yes. Now, my first contention I'm going to be very, very brief about, because I don't think it's going to hold a lot of weight in front of a panel, which is that BAB is not really a good decision. We didn't like BAB. I did petition for rehearing on BAB. The BAB court, the BAB panel, said that it was unreasonable not to extend a Federal law, and then the law being that, I guess the law that we argue doesn't exist is that changes in State law have to be applied retroactively. Now, the BAB court didn't buy that. They said that failure to do that was a violation of Taylor and Bunkley. But like I said, I want to be brief. Well, even though, you know, one of our colleagues here was on the case, but we're, as you know and appreciate, that is the law at this point. Oh, yes, ma'am. So we've got to go down that road. Yes, ma'am. You don't just want to be brief. You want to be effective. Yes. That's why I'd like to move on with the Justice's permission. But we're not going to carry a lot of weight. Yes, sir. So what I'd like to get on to is that this is an issue that was not exhausted. It is undisputed that the Fifth Amendment claim was never raised in State court. The way that the district court judge found this to be exhausted was to look at a reply brief, and under Nevada law, one is not permitted to raise new issues in a reply brief. In a reply brief, Mr. Kerrion in State court stated that this was a violation of the Sixth Amendment right to a fair trial. You know what? I appreciate the fact that you want to argue whatever you can for your client's benefit, but isn't your client in this case caught in a web of facts? Oh, I don't believe so. If you're asking me to move on to the harmless error analysis, I'll do that. I don't think — Well, go where you want to go. Well, I want to go where you want to go. Good answer. Let me just very briefly wrap up. It's undisputed that this claim was not raised. The Fifth Amendment claim, Polk, the issue that Polk created for the State of Nevada, relied on In re Winship and Sandstrom. Now, those cases said you have to prove every element beyond a reasonable doubt. We've never disputed that, but the Caslen instruction is like still-late-to-current instructions in Federal court. So there was never anything wrong with the Caslen instruction. Now, if you — if you — Mr. Kerrion tried to raise the Sixth Amendment claim. If you look at the Sixth Amendment, the Sixth Amendment simply does not lead you to Sandstrom and In re Winship. It doesn't get you there if you're looking for Sixth Amendment cases on point. And so the court said that it was a quibble. The district court said it was a quibble to say that the Fifth Amendment and Sixth Amendment are different in this circumstance. Now — I can't see if — he raises the Sixth Amendment. It's clear he's challenging the fairness of the trial that's used, and he's challenging that there's an improper reduction of the State's burden. So it seems to me that that's interrelated with a normal Fifth Amendment claim. I mean, it's all there, and it's hard to know what else he would be challenging. Well, let me answer with a rhetorical question, which is, then why not raise the Sixth Amendment claim that you exhausted in State court? Why not come to Federal court and raise a Sixth Amendment claim? He didn't. And he didn't because he didn't want to have to go forward on the Sixth Amendment when Polk was already in place, relying on the Fifth Amendment and in re Winship. The other question is, why not raise both? Why not raise the exhausted Fifth Amendment and the unexhausted Fifth Amendment, the exhausted Sixth Amendment? And he doesn't do that because he doesn't want to essentially admit that these are different in any way. I'm sorry. He doesn't do that because why? He doesn't want to. I mean, by raising both, I guess the way I look at this is by raising both the Fifth and Sixth Amendment, he would essentially be admitting, Mr. Keating would essentially be admitting that they're the same thing, or that they're not the same thing, which would mean he'd have to go back to State court and exhaust his Fifth Amendment claim, but his Sixth Amendment claim would be exhausted. I just don't – I guess my – I mean, the basis is that I don't understand why he doesn't raise a Sixth Amendment claim if everybody seems to think it would entitle him to the same relief if he had exhausted a Sixth Amendment claim. And I'd just like to make one last point because I'm very short on time, which is that it was in a reply brief, and you just can't do that in Nevada. You can't raise new arguments in a reply brief. Harmless error. It is – I mean, obviously – If it's addressed as it were an unfair trial, it doesn't matter if it was raised in a reply brief or not. I mean, it was – the Court addresses it, basically, at least as he paints the picture. Well, I guess I wish the Nevada Supreme Court had done more with the – I mean, I think the Nevada Supreme Court could have said, we're not going to consider this. And I do know the rule that you're speaking of that generally. It's both our rule and most every appellate court's rule. But I'm just wondering if it really was invoked here. But does the Nevada Supreme Court, I guess, do they have to go through every reply brief and say, oh, by the way, these arguments were not raised? I mean, is that – it's almost like how can they be expected – it has to be fair presentation. It has to be fair presentation. How can they be expected to go through every single reply brief and decide what issues were raised initially in an opening brief and what issues weren't? This is Mr. Kerian hunted down – very short on time, I'm sorry. Mr. Kerian hunts down Mr. Royles and shoots him. There is – and what I'm saying is if they'd used the deliberation instruction that's current under Byford, he would have been found guilty. The jury rejects voluntary manslaughter. They reject his self-defense claim. And – What did he address? Harmless error? Yes. He – I can't dispute that there was a horrible fight. And that Mr. Royles bit the ear off of Mr. Kerian. I think that's something everybody agrees on. Spat it in the back. And spat it right back at him, yes. Disgusting and inappropriate behavior. But you've got two versions. Either Mr. – It's not your Dolly of Nevada, I guess, so never mind. Yeah. And so you've got two versions of this. You've got either Mr. Kerian running for his gun and running to the garage. That's Mr. Kerian's version. Or you've got Mr. Woods' version, who is the only percipient witness who wasn't involved in the original struggle much, who says he hunts him down. He goes into a military stance. He's sweeping the halls. He sweeps his bedroom. And then he goes to the garage. Now, he opens the garage. And essentially, Mr. Royles is – from what I understood, he's standing at the button to open the door. There's a door – a car door out of the garage. He's standing at the button. Mr. Kerian swings the door open. The door swings in. And Mr. Royles says, no, don't. And Kerian starts shooting. I think that there's just – there's sufficient liberation. And I just wanted to point this out because I don't think I raised it specifically in my brief. But there's this point where Mr. Kerian hears the garage door beep, beep, beep, and he knows that Mr. Royles has gone out. He says he thinks he's looking through camping equipment or whatever. He never hears it beep a second time. So he doesn't hear him come back in. So Mr. Kerian can very easily just sit there. He's armed. He can sit there and he can wait, as Mr. Wood suggested, for the police to handle it. But he doesn't do that. He hunts him down. And that's the moment of deliberation. He decides to kill him. Do you want to save your remaining time? I do. Yeah. Thank you, Judge. I want the 15 minutes. I'm going to guess we're familiar with this case. Good morning. May it please the Court. My name is Ryan Norwood and I represent Mr. Kerian. I'd like to first address this exhaustion issue. And then unless the Court has any questions about the applicability of that, I'd like to go to harmless error. The Supreme Court says that there are three ways that you can exhaust a claim. You can cite a specific provision of the Constitution. Or you can cite a case that analyzes the federal issue. Or you can simply label the claim federal. This entire complaint that the State is making here regarding the Fifth Amendment versus the Sixth Amendment, at most goes towards the first of those three different ways that you can do it. The District Court correctly found that this complaint was a matter of form over substance. But even if the Court wasn't correct on that, the fact is that Mr. Kerian exhausted the claim the other two ways. In all of his briefing, in his opening brief and his reply brief, he cited a case called Garner versus State, in which the Nevada Supreme Court decided the exact issue that we're now talking about today. In Garner, this was a case that was tried before Byford and it was pending while Byford was decided. Garner asked the Nevada Supreme Court to apply Byford to him and raised it as a federal constitutional claim. That's what Garner said. That's how Mika, the case that overruled Garner, described Garner when it was talking about Garner. And that's how this Court talked about Garner when it described it in Babb. The Garner's – the problem that he had was that Garner was a case that decided the issue against him. But the problem – what the State is claiming is an exhaustion problem here is really a problem with the Nevada Supreme Court. The Nevada Supreme Court had already wrongly decided this issue against all Petitioners. They had claimed that there was no constitutional issue whatsoever with not applying Byford in Garner. So that's what Mr. Kerian was stuck with on appeal. His attorney didn't give up, though. He still raised the issue. He raised the Garner case and said, basically, would you make an exception for me? And, of course, the Nevada Supreme Court said no. But his problem wasn't the degree of presentation. He could have filed a 20-page brief, you know, outlining a treatise on the Fifth Amendment, the Sixth Amendment, and every other part of the Constitution. It would have made a difference. The problem was the Nevada Supreme Court had unreasonably decided there was no merit to the claim already. And now the Nevada Supreme Court realizes that it was wrong, and this Court in Babb realizes that it was wrong. The question here is whether this error can be deemed harmless. And I think the State in its discussion of the facts here is just missing the forest for the trees. I mean, this is a case in which Mr. Kerian undisputably was brutally attacked and mutilated in his own home by the decedent moments before he died. It's true that there are a lot of disputed facts in this case between what Mr. Kerian says and what the State's main witness, who is a friend of the decedent who clearly has some sort of grudge against Mr. Kerian, says. But the thing about this case is, even if you look at everything, these people are all, I think they call it the fugitive retrieval business. But when you say clearly, you're adding a little something that maybe you don't even need to add in order to prevail. Clearly nothing is so clear. Well, let me explain the basis of it then, Your Honor. I mean, throughout the testimony here, there is all sorts of arguments between these people about who owes who money for various work in the past. I mean, no doubt that he had to have some feelings about it. And the question is, do you take self-help or do you let the law provide the remedy? Well, that's where the disputed facts come in. Mr. Kerian says the reason he shot this person is when he stepped into the garage, the decedent started coming towards him and started taking something out of his jacket. He didn't want to wait to see what it was going to be, so he shot him. The man's gun is found in the garage right next to him. A lot of the physical evidence in this case, the district court notes, is much more consistent with what Mr. Kerian says than what this person, what the state's witness says. But again, the thing about this case is even if you want to take their case in chief at face value, it's very hard to see how a properly instructed jury could have concluded that this was first-degree murder instead of second-degree murder. There was an argument. Mr. Kerian walked away from the argument. He went into his bedroom. The decedent followed him in and picked a fight with him. When the witness came in, he saw Mr. Kerian's blood all over the bedroom. He followed the blood in the bathroom. The decedent has Mr. Kerian in the bathtub with one hand on his ponytail. They're fighting over a knife, which is against Mr. Kerian's face, and then he leans over and bites his ear off. What point are you arguing now? You're not arguing. Is this part of your harmless error argument? Yes, Your Honor. What I'm arguing is this. What a properly instructed jury would have had to have been told under Byford is that deliberation had to be proven beyond a reasonable doubt by the state. They have to prove that he was actually weighing the reasons for and against his action, and that this determination wasn't formed in passion, or if it was formed in passion, it was carried out after there had been time for the passion to subside and deliberation to occur. I've never had my ear bitten off, but I'm guessing that it hurts a lot, and I'm guessing that when you've had your ear bitten off... Sometimes severe injuries don't hurt at all at the time. It hurts a lot time later, but they don't hurt at the moment. He might have been in shock at the time. But that's not this record. We're going to decide it on the record, aren't we? Certainly. He may have been in shock at the time. This other person who the state's witness is holding a knife as he's getting out of the bathtub, what happens is Mr. Kieran gets his gun because he's terrified of this person who's still in the house with him, who he knows has a gun in the house, and he shoots him. What the state would have to prove is despite all these factors, that Mr. Kieran was able to calmly deliberate while not in heat of passion and make a conscious weighing and then shoot this person. If they can do that after a fair trial in which the jury is fairly instructive, then God bless them. But what I'm respectfully submitting is that there's no way that we can assume that that would happen based on the facts in this case. The only point I would make is that we're not drawing a white slate here. What are you saying? Just because there are two contested versions of what happened, it means it can't be harmless? No, I'm not saying that, Your Honor. I mean, it's all the more reason why it's hard to find the error harmless. What I'm saying is if you take the state's case at face value, it still looks a lot more like a murder committed in the heat of passion than it does a calmly premeditated and deliberate murder. The other point I would make is that we're not drawing on a blank slate here because there are two prior cases in which this Court has found that a casual in error could not be deemed harmless, and those were Polk and Chambers. I think any fair comparison of the facts in this case with the facts in those cases will show that the facts here are at least as compelling. Chambers, like this case, involves a fight between roommates where one roommate was stabbed 17 times as part of an emotional argument. To my knowledge, nobody bit anyone's ear off in that case, but the Court still ruled that the casual in error could not be deemed harmless. Polk was a case where the defendant shot the decedent multiple times, where there was evidence that he had threatened him several months before the shooting and where he was wearing a bulletproof vest at the time of the shooting. And the Court still found that that error could not be deemed harmless. What do you think should be our bottom line in your view? Well, the Court should affirm the decision of the district court below. If there are no further questions, I'll submit. All right. Mr. Woodman, I'll give you a little extra time because, again, it's kind of wound down there. I ran away a little bit. I just want to say a couple of things about harmless error. The evening started out with Mr. Kirian upset. He was upset from the get-go. He came out and asked his, I don't know, friends, guests, who were in the garage drinking beer and smoking marijuana, which upset him. He asked them to come back and help clean up dog droppings. And that's kind of where the evening began. He said that Broyles was smart-ass with me and kind of made me mad. And then Kirian later tells a jailhouse informant that he had intended to claim self-defense, even though it was essentially a fight that had gone wrong and he killed the guy. He's on the phone almost immediately claiming self-defense. In terms of the gun, now, there was a gun found in the garage. The gun was holstered and was unloaded. I don't think that somebody who claims to be this trained in bounty hunting or whatever it was these gentlemen were engaged in charges that another person with a holstered and unloaded gun. I just don't think that's what happened. I think Mr. Broyles, who could have killed Kirian at any moment in the bathtub, if you believe either of their stories, didn't, tried to flee and was not able to. Thank you very much for your time. Thank you. Case just argued. Kirian v. Nevada is submitted.
judges: Farris, Tashima, McKeown